Neal J. Stephens (State Bar No. 152071)
nstephens@jonesday.com
Vincent A. Doctor (State Bar No. 319408)
vdoctor@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone:   +1.650.739.3939
Facsimile:   +1.650.739.3900

*Attorneys for Plaintiff Amos Jones*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMOS JONES, | **Case No. 20-cv-04093-TSH** |
| Plaintiff, | |
| v. | **PLAINTIFF'S MOTIONS IN LIMINE** |
| S. MORA, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................ 1

II.     ARGUMENT ................................................................................................................ 1

      A.     MIL #1 – This Court Should Exclude Evidence of and References to Mr. Jones's Criminal History .................................................................................. 2

      B.     MIL #2 – This Court Should Exclude Evidence of and References to Mr. Jones's Prison Disciplinary History and Gang Affiliation ................................... 4

           1.     Disciplinary history after the sexual assault search ................................... 4

           2.     Disciplinary history before the sexual assault search ................................ 5

           3.     Gang affiliation ......................................................................................... 8

      C.     MIL #3 – This Court Should Exclude Evidence of and References to Other Complaints Filed by Mr. Jones .......................................................................... 9

      D.     MIL #4 – This Court Should Permit Mr. Jones to Attend Trial Without Shackles .......................................................................................................... 10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Brooks v. Haggett,*
   2010 WL 4226693 (N.D. Cal. 2010)..................................................................... 10

*Caruso v. Solorio,*
   No. 115CV780AWIEPGPC, 2021 WL 22498 (E.D. Cal. Jan. 4, 2021)................... 6

*Castro v. Cty. of L.A.,*
   No. 2:13-cv-06631, 2015 WL 4694070 (C.D. Cal. Aug. 3, 2015) ........................... 2

*Claiborne v. Blauser,*
   934 F.3d 885 (9th Cir. 2019)......................................................................... 10, 11

*Davidson v. Riley,*
   44 F.3d 1118 (2d Cir. 1995)................................................................................ 10

*Davis v. Mason County,*
   927 F.2d 1473 (9th Cir. 1991)............................................................................... 7

*Duckett v. Godinez,*
   67 F.3d 734 (9th Cir. 1995).................................................................................. 11

*Dupard v. Kringle,*
   76 F.3d 385, 1996 WL 56098 (9th Cir. 1996) ....................................................... 10

*Ellis v. Navarro,*
   No. C 07-5126, 2012 WL 3580284 (N.D. Cal. Aug. 17, 2012)................................ 6

*Harrell v. Israel,*
   672 F.2d 632 (7th Cir. 1982)............................................................................... 10

*Henderson v. Peterson,*
   No. C 07-2838 SBA PR, 2011 WL 2838169 (N.D. Cal. July 15, 2011) ...................... 7, 9, 10

*Holmes v. Slay,*
   895 F.3d 993 (8th Cir. 2018)................................................................................. 4

*Illinois v. Allen,*
   397 U.S. 337 (1970) ............................................................................................ 10

*Jacobs v. Alexander,*
   No. 1:05-cv-01625, 2016 WL 4440957 (E.D. Cal. Aug. 22, 2016)......................... 7

*Johnson v. California,*
   543 U.S. 499 (2005) .............................................................................................. 8

*Jones v. Meyer,*
   899 F.2d 883 (9th Cir. 1990)............................................................................... 11

*Kennedy v. Lockyer*,
379 F.3d 1041 (9th Cir. 2004) ................................................................................. 8

*Llague v. Mingey*,
763 F.2d 1560 (7th Cir. 1985) .................................................................................. 8

*Morgan v. Bunnell*,
24 F.3d 49 (9th Cir. 1994) ...................................................................................... 11

*Outley v. City of New York*,
837 F.2d 587 (2d Cir. 1988) ................................................................................... 10

*Ruvalcaba v. City of Los Angeles*,
64 F.3d 1323 (9th Cir. 1995) .................................................................................... 2

*Scott v. Lawrence*,
36 F.3d 871 (9th Cir. 1994) ...................................................................................... 3

*Seals v. Mitchell*,
No. C 04–3764 NJV, 2011 WL 1399245 (N.D. Cal. April 13, 2011) ........................... 7, 9, 10

*Silva v. Chung*,
No. 15-00436, 2019 WL 2292073 (D. Haw. May 29, 2019) ........................................ 2

*Simpson v. Thomas*,
528 F.3d 685 (9th Cir. 2008) .................................................................................... 3

*Stevenson v. Holland*,
504 F. Supp. 3d 1107 (E.D. Cal. 2020) .................................................................. 5, 8

*Tyars v. Finner*,
709 F.2d 1274 (9th Cir. 1983) ................................................................................ 10

*United States v. Bagley*,
772 F.2d 482 (9th Cir. 1985) .................................................................................... 4

*United States v. Bay*,
762 F.2d 1314 (9th Cir. 1984) .................................................................................. 3

*United States v. Bensimon*,
172 F.3d 1121 (9th Cir. 1999) .................................................................................. 3

*United States v. Dickens*,
775 F.2d 1056 (9th Cir. 1985) (distinguishing *United States v. Abel*, 469 U.S.
45 (1984) .......................................................................................................... 8

*Wilson v. McCarthy*,
770 F.2d 1482 (9th Cir. 1985) ........................................................................... 10, 11

**OTHER AUTHORITIES**

Fed. R. Evid. 401 ....................................................................................................... 1, 5

Fed. R. Evid. 402 ................................................................................................... passim

Fed. R. Evid. 403 ................................................................................................... passim

Fed. R. Evid. 404 ....................................................................................................... 10

Fed. R. Evid. 404(a)(1) ................................................................................................ 1

Fed. R. Evid. 404(b) ......................................................................................... 7, 9, 10

Fed. R. Evid. 404(b)(1) ................................................................................................ 1

Fed. R. Evid. 404(b)(2) ................................................................................................ 1

Fed. R. Evid. 609 ......................................................................................................... 2

Fed. R. Evid. 609(b) ..................................................................................................... 3

Fed. R. Evid. 802 ......................................................................................................... 7

1

## I.     INTRODUCTION

Mr. Jones respectfully brings these four motions *in limine* to minimize evidentiary disputes during trial.  Mr. Jones requests that the Court enter:

1. An order excluding all evidence of and references to Mr. Jones's criminal history.

2.  An order excluding all evidence of and references to Mr. Jones's prison disciplinary history and alleged gang affiliation.

3. An order excluding all evidence of and references to all prison grievances filed by Mr. Jones other than the two grievances underlying this action.

4. An order permitting Mr. Jones to attend trial without shackles or other restraints.

## II.     ARGUMENT

The following rules of evidence guide the Court's determination of whether to admit or exclude evidence at trial.  First, only relevant evidence is admissible.  Fed. R. Evid. 402.  Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.  Fed. R. Evid. 401.  Second, even if relevance is established, the court may exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

Third, in general, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  Fed. R. Evid. 404(a)(1).  Likewise, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  But evidence of a crime, wrong, or other act may be admitted for another purpose, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  Fed. R. Evid. 404(b)(2).

**A.    MIL #1 – This Court Should Exclude Evidence of and References to Mr. Jones's Criminal History**

The Court should exclude all evidence of and reference to the crimes Mr. Jones has been convicted of:  PC 187 (Murder), PC 664/187 (Attempted Murder), PC 12022.53(d) (Discharge Firearm Causing Death/Great Bodily Injury), and PC 12021(a)(1) (Ex-Felon Possession of Firearm), Los Angeles County, Case #BA227979, convicted on 11/22/2002.  This request includes the redaction of all references in any document Defendants seek to introduce that otherwise contains admissible material.  The convictions should be excluded because they are irrelevant, and thus inadmissible under Rule 402, and the prejudicial effect of the convictions substantially outweighs their probative value, making them inadmissible under Rules 609 and 403.

First, none of these convictions are relevant to Mr. Jones's claims and are thus inadmissible. Fed. R. Evid. 402.  Mr. Jones is seeking damages for violations of his First and Eighth Amendment rights arising out of a sexual assault he suffered at the hands of Defendants during a pretextual clothed body search at the prison.  Evidence of Mr. Jones's prior convictions is neither "of consequence in determining the action" nor does it have any tendency to make a fact of consequence more or less probable.

Moreover, neither defendant was aware of Mr. Jones's criminal history prior to the clothed body search, thus the evidence is irrelevant to Defendants' state of mind leading up to and during the search.  *See* Exhibit A, Transcript of the Deposition of Defendant Sergio Mora ("Mora Tr.") at 32:2–33:4 (Mora testifying he had never met Jones before the 2019 search, he has never reviewed Jones's central file, and he does not know why Mr. Jones is incarcerated); Exhibit B, Transcript of the Deposition of Defendant Haley Madsen ("Madsen Tr.") at 28:11-13, 29:2-4 (Madsen has not reviewed Jones's central file and is not aware of why Mr. Jones is incarcerated).[1]    Further,

---

[1] *See also Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (officers allowed to testify in limited manner about only the facts known to them at the time of the incident regarding plaintiff's criminal history); *Silva v. Chung*, No. 15-00436 HG-KJM, 2019 WL 2292073, at *7-8 (D. Haw. May 29, 2019) (evidence of plaintiff's prior arrest was not admissible without evidence that defendant officers were aware of the arrest); *Castro v. Cty. of L.A.*, No. 2:13-cv-06631, 2015 WL 4694070, at *9 (C.D. Cal. Aug. 3, 2015) (plaintiff's prior convictions not relevant to claim when officer was not aware of plaintiff's criminal record at time of incident).

1   Defendants maintain that the clothed body search of Mr. Jones was "random."  Mora Tr. at 78:7-

2   14.[2]  In other words, Mr. Jones's criminal history did not factor into Defendants' decision to search

3   him.  Thus, the convictions are irrelevant.

4       Second, Mr. Jones's convictions are not admissible to impeach him as a witness because

5   their prejudicial effect substantially outweighs their trivial probative value.  *See* Fed. R. Evid.

6   609(b).  Since Mr. Jones's convictions are more than 10 years old, Rule 609(b) provides that

7   evidence of the convictions is admissible only "if its probative value, supported by *specific facts*

8   *and circumstances*, substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b) (emphasis

9   added); *see also United States v. Bay*, 762 F.2d 1314, 1317 (9th Cir. 1984) ("Evidence of a

10  conviction more than ten years old is presumptively inadmissible as too remote.").  The advisory

11  committee notes to Rule 609(b) "clearly state 'that convictions over 10 years old will be admitted

12  very rarely and only in exceptional circumstances.'"  *United States v. Bensimon*, 172 F.3d 1121,

13  1126–1127 (9th Cir. 1999) (quoting in part Fed. R. Evid. 609(b) advisory committee's notes); *see*

14  *also Simpson v. Thomas*, 528 F.3d 685, 690 (9th Cir. 2008) (section 1983 case citing same advisory

15  committee note to exclude convictions under Rule 609(b)).

16      Mr. Jones's convictions are all well over 10 years old; in fact, they will all be over 20 years

17  old by the time trial is set to begin in this case.  What is more, the severe prejudicial effect of Mr.

18  Jones's convictions is plain.  Allowing the jury to hear of Mr. Jones's murder conviction and life

19  sentence will unfairly prejudice Mr. Jones by putting his character on trial instead of Defendants'

20  conduct.  In *Scott v. Lawrence*, 36 F.3d 871, 875 (9th Cir. 1994), a section 1983 prisoner case, the

21  Ninth Circuit ruled that the district court's *sua sponte* revelation to the jurors, during voir dire, that

22  the plaintiff had two prior rape and sexual assault convictions, was reversible error.  The Court

23  reasoned that "rape and sexual assault convictions are among the most prejudicial types of

24  information the jury could learn about the plaintiff in a civil suit."  *Id.* at 874.  Mr. Jones's

25

26  _____

[2] "Q. Whose decision was it to search Mr. Jones?  A. My decision.  Q. And why did you decide to
    search him?  A. It was randomly." *See also* Madsen Tr. at 95:3-16, 96:20–97:7, 99:18-22

27  (Defendant Madsen explaining that she does not believe she was at the search "on the initial
    contact" between Defendant Mora and Mr. Jones, and that when she works corridor coverage at

28  the prison, her pat down searches are completely random).

1   convictions are even more prejudicial than rape and sexual assault and should similarly be excluded

2   here.  Plus, Mr. Jones's convictions are not probative of his veracity as a witness.  Indeed, "prior

3   felony convictions which do not in themselves implicate the veracity of a witness may have little

4   impact on credibility." *United States v. Bagley*, 772 F.2d 482, 487 (9th Cir. 1985) ("[T]he question

5   of the truth or falsity of a witness's statement generally is not advanced in any material way by a

6   showing of his prior conviction . . . unless issues of credibility are otherwise directly involved.");

7   *see also Holmes v. Slay*, 895 F.3d 993, 1000 (8th Cir. 2018) (holding prisoner-plaintiff's prior

8   conviction for drug trafficking not admissible under FRE 609(a) or 404(b) and emphasizing the

9   important distinction between a criminal trial and a section 1983 civil trial where the focus is

10  squarely on the conduct of the defendant officers and not the plaintiff's conduct).

11          Lastly, Mr. Jones's convictions should be excluded under Rule 403 as unfairly prejudicial.

12  Fed. R. Evid. 403.  As explained above, Mr. Jones's convictions are not probative of any fact of

13  consequence in this action, including Mr. Jones's credibility as a witness.  Also, in addition to the

14  danger of severe unfair prejudice of Mr. Jones being labeled as a "murderer" by the jury, Mr.

15  Jones's past convictions will only serve to confuse the issues and mislead the jury by focusing the

16  jury's attention on Mr. Jones's criminal conduct 20 years ago when that conduct was not even on

17  Defendants' radar when they searched Mr. Jones—the material issue in this case.  Therefore, Mr.

18  Jones's prior convictions should be excluded.

19      **B.      MIL #2 – This Court Should Exclude Evidence of and References to Mr.
20              Jones's Prison Disciplinary History and Gang Affiliation**

21              **1.      Disciplinary history after the sexual assault search**

22          The Court should exclude all evidence relating to Jones's conduct within the prison after

23  November 23, 2019—the day of the sexual assault search for which Mr. Jones bring this action.

24  This includes all evidence regarding an alleged conspiracy to introduce controlled substances into

25  the prison on or around February 26, 2020, and placement in administrative segregation.  *See* Bates

26  No.  AEO0000003–07  (police  report),  AEO0000197–202  (administrative  segregation  unit

27  placement notice).

28

All evidence relating to Mr. Jones's conduct within the prison after the November 23, 2019, search underlying this case is irrelevant and therefore inadmissible.  Fed. R. Evid. 401, 402; *see, e.g., Stevenson v. Holland*, 504 F. Supp. 3d 1107, 1135 (E.D. Cal. 2020) (excluding evidence of all disciplinary events occurring after the two incidents underlying the action as irrelevant). The question in this case is whether Defendant Madsen had Defendant Mora sexually assault Mr. Jones in retaliation for Mr. Jones filing a prison grievance, "602," against her.  Any evidence regarding Mr. Jones's conduct in the prison after the date of the sexual assault is irrelevant to that question because it has no tendency to make any fact of consequence more or less probable.

Moreover, all evidence of Mr. Jones's conduct within the prison after November 23, 2019, is inadmissible under Rule 403 because the danger of unfair prejudice substantially outweighs its probative value.  Fed. R. Evid. 403.  As described above, there is no probative value of Mr. Jones's prison disciplinary issues after the sexual assault.  And, even if it was somehow probative, the unfair prejudice to Mr. Jones is substantial because the jury will hear that Mr. Jones was allegedly trying to introduce drugs into the prison after the relevant events in this case.  This "evidence" will confuse the issues and mislead the jury by causing the jury to focus on Mr. Jones's conduct that had no bearing on the sexual assault search, and to perhaps impute knowledge of the conspiracy to Defendants, thereby wrongfully supplying an innocent motive that Defendants did not have in conducting the pretextual clothed body search.

### 2.     Disciplinary history before the sexual assault search

The Court should also exclude all evidence relating to Jones's conduct within the prison before November 23, 2019, and any consequences for prison misconduct (e.g., loss of visitation privileges, yard privileges, etc.). This includes, but is not limited to:

(1) Positive test for amphetamine and methamphetamine on January 19, 2015;

(2) Possession of methamphetamine and cell phone on May 8, 2018;

(3) Positive test for amphetamine on December 31, 2014;

(4) Inmate manufactured alcohol on February 5, 2011, and December 21, 2013;

(5) Possession of cell phones in 2012, 2013, 2014, and 2019; and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(6) Willful delay of a peace officer in performance of duties by trying to destroy cell phone.

First, evidence of Mr. Jones's prison disciplinary record is not admissible because it is not relevant to the present action, i.e., whether Defendants retaliated against Mr. Jones by sexually assaulting him during a clothed body search. *See* Fed. R. Evid. 402. Evidence of Mr. Jones's prior disciplinary history is neither "of consequence in determining the action" nor does it have any tendency to make a fact of consequence more or less probable.

Mr. Jones's disciplinary history is not relevant to Defendants' state of mind in searching Mr. Jones because there is no evidence Defendants were aware of Mr. Jones's disciplinary history when they searched him. In fact, their deposition testimony suggests the opposite. Neither Defendant ever reviewed Mr. Jones's central file where his disciplinary history is located. Ex. A, Mora Tr. at 32:25–33:2; Ex. B, Madsen Tr. at 28:11-13, 29:2-4. Mr. Jones had never caused any trouble for Mora or Madsen in their careers. Ex. A, Mora Tr. at 34:1-6; Ex. B, Madsen Tr. at 31:16-18. Defendant Madsen claims she believed Mr. Jones to be a threat to the security of the prison, but cites the alleged narcotics conspiracy cited above that occurred after the November 23, 2019, sexual assault. Ex. B, Madsen Tr. at 32:7–33:17. Section 1983 cases in this circuit make clear that disciplinary history is only relevant when defendant-officers were at least aware of it. *See, e.g., Caruso v. Solorio*, No. 115CV780AWIEPGPC, 2021 WL 22498, at *13 (E.D. Cal. Jan. 4, 2021) (excluding prior bad acts of plaintiff because "there is no indication that any Defendants were aware of Caruso's drug trafficking activities in prison. If no Defendant was aware of Caruso's prior prison drug tracking activities, then that evidence could play no role in the justification for either the search or the handcuffing of Caruso."); *Ellis v. Navarro*, No. C 07-5126, 2012 WL 3580284, at *8-12 (N.D. Cal. Aug. 17, 2012) (excluding prisoner's disciplinary record where defendants were not aware of prior disciplinary history at time of incident). More to the point, even if defendants were aware of Mr. Jones's disciplinary history, it is still not relevant to Defendants' state of mind in searching Jones because Defendants have consistently maintained in this action, including multiple

1  admissions in their depositions, that the clothed body search of Mr. Jones was completely random—

2  i.e., not influenced by prior events.[3]

3      Second, Mr. Jones's prison disciplinary record constitutes inadmissible character evidence

4  of other wrongs or acts.  Fed. R. Evid. 404(b); *see Seals v. Mitchell*, No. C 04–3764 NJV, 2011 WL

5  1399245, at *6 (N.D. Cal. April 13, 2011) (granting prisoner's motion in limine to exclude his

6  prison disciplinary record because it is "not relevant, is prejudicial, constitutes inadmissible

7  character evidence of other wrongs or acts, and is inadmissible hearsay.") (citing Fed. R. Evid. 402,

8  403, 404(b), & 802); *Henderson v. Peterson*, No. C 07-2838 SBA PR, 2011 WL 2838169, at *3

9  (N.D. Cal. July 15, 2011) (same); *Jacobs v. Alexander*, No. 1:05-cv-01625, 2016 WL 4440957, at

10  *11 (E.D. Cal. Aug. 22, 2016) (granting prisoner's motion in limine to exclude his prison

11  disciplinary record because it is not relevant, is prejudicial, constitutes inadmissible character

12  evidence of other wrongs or acts.); *Davis v. Mason County*, 927 F.2d 1473, 1484 (9th Cir. 1991)

13  (district court properly excluded evidence of plaintiff's prior assault under Rule 404 in a section

14  1983 case).  Evidence of Mr. Jones's prior disciplinary history would only serve to paint Mr. Jones

15  as someone with a character for breaking prison rules and thus deserving the pretextual clothed

16  body search.  This is the definition of character evidence, and thus it should be excluded under Rule

17  404(b).

18      Lastly, the probative value of Mr. Jones's prison disciplinary record is substantially

19  outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and

20  wasting the time of the Court, jury, and parties.  *See* Fed. R. Evid. 403.  Presenting Mr. Jones's

21  incidents of prison discipline will prejudice the jury against Mr. Jones and distract the jury from

22  the main issue in this action—Defendants' conduct.  Such evidence will also mislead the jury from

23  focusing on a key issue—that the "integrity of the criminal justice system depends on full

24  compliance with the Eighth Amendment," *Johnson v. California*, 543 U.S. 499, 511 (2005), and

25

26  [3]  "Q. Whose decision was it to search Mr. Jones?  A. My decision.  Q. And why did you decide to search him?  A. It was randomly."  *See also* Madsen Tr. at 95:3-16, 96:20–97:7, 99:18-22

27  (Defendant Madsen explaining that she does not believe she was at the search "on the initial contact" between Defendant Mora and Mr. Jones, and that when she works corridor coverage at

28  the prison, her pat down searches are completely random).

that civil rights actions by prisoners "serve an essential deterrent function." *Llagune v. Mingey*, 763 F.2d 1560, 1579 (7th Cir. 1985). Permitting the jury to hear irrelevant, prejudicial evidence regarding Mr. Jones's disciplinary history will only serve to put Mr. Jones on trial when this action is about the Defendants' conduct.

### 3.    Gang affiliation

Similarly, the Court should exclude all evidence of Mr. Jones's alleged gang affiliation. Though it is not clear from discovery whether Mr. Jones is or was actually affiliated with a gang in or out of the prison, there were a couple mentions of alleged gang affiliation that the Court should not let into trial. *See* Bates. No. AEO0000029-30 (Mr. Jones's alleged association with "Venice Shoreline Crips" outside of prison); Ex. B, Madsen Tr. at 73:14–17 (Madsen's uncorroborated claim that Mr. Jones is allegedly associated with "Black Guerilla Family").

Similar to the prison disciplinary discussion above, Mr. Jones's alleged gang affiliation is not relevant to the facts of consequence in this case—Madsen testified she was not there at the beginning of the sexual assault search, and Mora testified he searched Mr. Jones "randomly." Thus, Mr. Jones's alleged gang affiliation is not relevant to Defendants' state of mind or motive in searching him. Moreover, in the Ninth Circuit, "it is well-established that gang affiliation evidence presents a very high danger of substantial prejudice." *Stevenson v. Holland*, 504 F. Supp. 3d 1107, 1138 (E.D. Cal. 2020) (citing *Kennedy v. Lockyer*, 379 F.3d 1041, 1055–1056 (9th Cir. 2004) ("Our cases make it clear that evidence relating to gang involvement will almost always be prejudicial[.]")). Thus, Mr. Jones's alleged gang affiliation should be excluded under Rule 403. While gang membership might be admissible to the extent it bears on a witness's bias when a witness and a party are members of the same gang, gang membership itself is not probative of truthfulness. *See United States v. Dickens*, 775 F.2d 1056, 1058-59 (9th Cir. 1985) (distinguishing *United States v. Abel*, 469 U.S. 45 (1984), where the Court permitted cross-examination on common gang membership to show bias). There is no evidence that Mr. Jones is associated with the same gang as any potential prison witness in this case. Therefore, this evidence must be excluded to avoid unfair prejudice.

1

2

### C.    MIL #3 – This Court Should Exclude Evidence of and References to Other Complaints Filed by Mr. Jones

3

4

5

Mr. Jones has filed multiple prison grievances during his time at CTF that should be excluded as unfairly prejudicial and impermissible character evidence.  To Mr. Jones's knowledge, these complaints include: Bates No. AEO00000622 (complaint against Lt. Marquez for being unprofessional during Jones's disciplinary hearing); 639 (complaint against food service manager for interfering with Jones's observation of Ramadan); 651 (complaint against CO Ragasa for searching Jones's cell for sole purpose of making sure he "get[s] another case"); 716 (complaint against CO Luna for giving Jones 2 RVRs in retaliation for "602-ing" an officer); and Jones–000684–87 (complaint against Sgt. Virrueta for retaliatory search on February 28, 2022).  This a retaliation case—Mr. Jones was retaliated against for filing a prison grievance.  Defendants should not be allowed to effectively further retaliate against Mr. Jones for filing prison grievances by putting on this evidence at trial.

6

7

8

9

10

11

12

13

14

First, pursuant to Rule 403, the Court should preclude Defendants from presenting evidence concerning other prison grievances initiated by Mr. Jones that are unrelated to the incident forming the basis of this action.  *See Henderson,* 2011 WL 2838169, at *5 (excluding all of plaintiff's unrelated complaints under Rule 403); *Seals*, 2011 WL 1399245, at *5 (excluding references to plaintiff's other lawsuits or grievances under Rule 403 and 404(b)).  While evidence of Mr. Jones's other grievances might have some relevance to whether he was biased against law enforcement, the probative value of this evidence is substantially outweighed by the danger of unfair prejudice.  "The charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent . . . [a plaintiff's] litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant. The trial court has a duty to prevent exploitation of this prejudice . . .." *Seals,* 2011 WL 1399245, at *5 (quoting *Outley v. City of New York*, 837 F.2d 587, 592 (2d Cir. 1988)).  Previous grievances filed by Mr. Jones have not been shown to be fraudulent.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTIONS IN LIMINE
CASE NO. 20-CV-04093-TSH

1    Furthermore, "evidence of Plaintiff's litigiousness is inadmissible character evidence."

2    *Seals*, 2011 WL 1399245, at \*5; *see also Henderson*, 2011 WL 2838169, at \*6 ("Defendants'

3    theory of admissibility [that plaintiff's litigation history goes to his ability to be truthful and whether

4    he has a tendency to file unmeritorious litigation] reveals that they are seeking to admit such

5    evidence for the improper purpose of attacking Plaintiff's character."); *Dupard v. Kringle*, 76 F.3d

6    385, 1996 WL 56098, at \*4–5 (9th Cir. 1996) ("Evidence regarding [the plaintiff's] general

7    aggressiveness and litigiousness is precisely the type of character evidence admitted to prove

8    propensity that is prohibited by Rule 404 .").  This evidence does not go to Mr. Jones's motive, so

9    as to be admissible under the 404(b) exceptions.  "FRE 404(b) contemplates admission of evidence

10    to show the motive for the underlying act committed, rather than a motive for bringing suit." *Brooks*

11    *v. Haggett,* 2010 WL 4226693, at \*12 (N.D. Cal. 2010) (emphasis added).    Therefore, evidence

12    of or references to Mr. Jones's prior prison grievances should be excluded as unfairly prejudicial

13    and impermissible character evidence.

14       **D.    MIL #4 – This Court Should Permit Mr. Jones to Attend Trial Without**
15       **Shackles**

16    The United States Supreme Court and the Ninth Circuit have repeatedly cautioned that,

17    because of significant prejudice to the prisoner, shackling may be justified only "as a last resort,"

18    in cases of "extreme need," or in cases "urgently demanding that action."[4]  These principals apply

19    to civil and criminal trials alike, and courts have recognized the significant risk of prejudice to a

20    civil prisoner-plaintiff where the core issue in the plaintiff's case is his credibility—as it is here.[5]

21    While discretionary, a court's decision to order shackling is guided by a two-step test: "First

22    the court must be persuaded by compelling circumstances that some measure [is] needed to

23    maintain the security of the courtroom.  Second, the court must pursue less restrictive alternatives

24    _____

25    [4] *See Wilson v. McCarthy*, 770 F.2d 1482, 1485 (9th Cir. 1985) (citing *Illinois v. Allen*, 397 U.S. 337, 344 (1970), *Harrell v. Israel*, 672 F.2d 632, 635–36 (7th Cir. 1982), and *Tyars v. Finner,* 709 F.2d 1274, 1284 (9th Cir. 1983))

26    [5] *See, e.g., Claiborne v. Blauser*, 934 F.3d 885, 897 (9th Cir. 2019) (citing *Davidson v. Riley*, 44
27    F.3d 1118, 1122–23 (2d Cir. 1995) (noting significant potential for prejudice of shackles because "the verdict apparently was to turn on whether the jury would believe [section 1983 prisoner-plaintiff] and his prisoner-witnesses or the [prison] witnesses"))

28

1    before imposing physical restraints." *Morgan v. Bunnell*, 24 F.3d 49, 51 (9th Cir. 1994) (citing

2    *Jones v. Meyer*, 899 F.2d 883, 885 (9th Cir. 1990)).

3         Here, no compelling circumstances exist to warrant shackles, thus there is no need for the

4    Court to move to step two of the two-step test.  First, Mr. Jones's "status as a convicted felon is not

5    sufficient" to support a finding of compelling circumstances for shackling.  *Claiborne v. Blauser*,

6    934 F.3d 885, 898 (9th Cir. 2019) (citing *Duckett v. Godinez*, 67 F.3d 734, 749 (9th Cir. 1995)

7    (holding that conviction on *two* counts of murder alone is not sufficient basis for shackling).

8    Second, Mr. Jones does not have a propensity for violence or history of attempted escapes that

9    would constitute compelling circumstances.  "In all the cases in which shackling has been approved,

10   there has also been evidence of disruptive courtroom behavior, attempts to escape from custody,

11   assaults or attempted assaults while in custody, or a pattern of defiant behavior toward corrections

12   officials and judicial authorities."  *Duckett*, 67 F.3d at 749.  Here, there is zero evidence of

13   disruptive courtroom behavior, attempts to escape from custody, assaults or attempted assaults

14   while in custody, or a pattern of defiant behavior toward corrections official or judicial authorities.

15   The only discipline Mr. Jones has faced at CTF involves possession of cell phones and controlled

16   substances (See MIL #2 above for list of Mr. Jones's disciplinary infractions).  Mr. Jones does not

17   have a history of violent offenses in prison over the last twenty-plus years.  Since at least 2014 to

18   2020, Mr. Jones's prison placement score, which is based on his security risk and RVRs, has

19   consistently been in the low 19 to 20 range resulting in security level II.  *See* Exhibit C, Bates No.

20   AEO0001252.  The scoresheet indicates that 19 is also the mandatory minimum score for Mr. Jones.

21        Moreover, Mr. Jones has not made any "attempts to escape from custody," that would

22   qualify him as a "serious threat to escape," warranting shackles.  *See Wilson v. McCarthy*, 770 F.2d

23   1482, 1485 (9th Cir. 1985).  Conclusory speculations that Mr. Jones may have a motive to escape

24   because of his long prison sentence, or that Mr. Jones may have the means to coordinate an escape

25   because of his past possession of cell phones,[6] does not constitute direct evidence of compelling

26   circumstances warranting shackles demanded by the case law.

27   _____
     [6] It is important to note that Mr. Jones's last possession of a cell phone was ***over three years ago***.
     *See* AEO00000288–301 (October 2019 RVR for cell phone).

28

1      Even if there were compelling circumstances justifying some increased security measures,

2  shackling would not be the least restrictive alternative required to ameliorate the unfair prejudice

3  to Mr. Jones.  The least restrictive alternative would be placement of additional law enforcement

4  in the gallery.

5

6  Dated: October 13, 2022               */s/ Vincent A. Doctor*

7                              Vincent A. Doctor (SBN 319408)
                                JONES DAY

8                              1755 Embarcadero Road
                              Palo Alto, CA  94303

9                              Tele.:   (650) 739-3939
                              Fax:    (650) 739-3900

10                            Attorneys for Plaintiff
                            AMOS JONES

11

12

13  NAI-1533448147

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

May 11, 2022
Sergio Mora

JONES vs MORA



```
            UNITED STATES DISTRICT COURT              1              APPEARANCES (CONTINUED)
         FOR THE NORTHERN DISTRICT OF CALIFORNIA      2
                SAN FRANCISCO DIVISION                3    FOR DEFENDANTS MADSEN AND MORA:
                    ::::::::                          4        ATTORNEY GENERAL OF CALIFORNIA
                                                      5        By:  MICHAEL QUINN
                                                      6        Deputy Attorney General
   AMOS JONES,                                        7        455 Golden Gate Avenue, Suite 11000
                                    CERTIFIED         8        San Francisco, California 94102-7004
                                    TRANSCRIPT        9        415.510.3611
             Plaintiff,                              10        E-mail: Michael.Quinn@doj.ca.gov
   vs.                         No.: 3:20-cv-04093-TSH 11
   S. MORA, ET AL.,                                  12
             Defendants.                             13
   _____/                       14
                                                     15
                                                     16                ::::::::
            REMOTE DEPOSITION VIA ZOOM OF            17
                 SERGIO MORA                         18
            Wednesday, May 11, 2022                  19
                                                     20
                                                     21
                                                     22
   REPORTED BY:                                      23
   MARY ANN SCANLAN, CSR NO. 8875 RMR-CRR-CCRR-CLR   24
                                                     25
                                                                                        Page 3
```



SCANLAN STONE
REPORTERS
Certified Shorthand Reporters
408 Columbus Avenue, Suite 2, San Francisco CA 94133
o / 415.834.1114   f / 415.399.9266
e / info@scanlanstone.com  w / scanlanstone.com

```
1              APPEARANCES                        1                 I N D E X
2    FOR THE PLAINTIFF AMOS JONES:                2    EXAMINATION                        PAGE
3        JONES DAY                                3    By Ms. Davidson                       9
4        BY:  KELSEY DAVIDSON                     4
5        Attorney at Law                          5
6        555 California Street, 26th Floor        6                ::::::::
7        San Francisco, California 94104          7
8        415.626.3939                             8
9        Email: kelseydavidson@jonesday.com       9
10                                               10
11       JONES DAY                               11
12       BY:  KYLE MORENO                        12
13       Attorney at Law                         13
14       1755 Embarcadero Road                   14
15       Palo Alto, California  94303            15
16       650.739.3968                            16
17       Email:  kamoreno@jonesday.com           17
18                                               18
19                                               19
20                                               20
21                                               21
22                                               22
23                                               23
24                                               24
25                                               25
                                    Page  2                                         Page  4
```

1    A.  I was a housing unit officer, so the functions
2  of the housing unit consisted of unlocks, making sure
3  inmates went to yards, day room, they got to education
4  if they needed to be in education, medical appointments
5  if they needed to be in medical appointments, making
6  sure they were at their appointments.
7      Q.  And did part of that include doing searches of
8  inmates at various times?
9    A.  Yes.
10    Q.  During that time, who did you report to?
11    A.  My immediate supervisor.
12    Q.  Do you remember who your immediate supervisor
13  was?
14    A.  I don't recall.
15    Q.  Did you ever have anyone reporting to you
16  during that time?
17    A.  No.
18    Q.  And were you part of a specific group?
19    A.  I don't understand the question.
20    Q.  You mentioned ISU at one point when you were
21  assigned at the Delta wing, was there a different group
22  you were a part of at that time?
23    A.  No, I was a housing unit officer in Delta
24  wing.
25    Q.  Then after Delta wing, what was your next

1  position?
2    A.  The investigative services unit, which I'm
3  currently at.
4      Q.  Do you remember when you started there?
5    A.  Mid-2020.
6      Q.  And did you apply for that transfer?
7    A.  Yes.
8      Q.  Why did you apply?
9    A.  For promotion purposes, and I always wanted to
10  be in the investigative services unit.
11    Q.  When you say for promotion purposes, does that
12  mean that ISU is a higher-ranking position than a
13  housing officer?
14    A.  Not necessarily.
15    Q.  Are you currently in a position that's a
16  higher rank than you were back in 2019 to 2020?
17    A.  Not necessarily.  I'm still a correctional
18  officer, just different title.
19    Q.  What do you do in the investigative services
20  unit?
21    MR. QUINN:  Objection.  Calls for a narrative.
22    You can answer.
23    THE WITNESS:  I'm currently assigned to
24  investigations, so I investigate any contraband being
25  introduced into the prison, providing safety and

1  security to the institution.
2  BY MS. DAVIDSON:
3      Q.  Anything else?
4    A.  Conducting criminal investigations in regards
5  to inmates conducting any criminal organizations here at
6  the prison.
7      Q.  Is there anything else?
8    A.  No.
9      Q.  And you mentioned your job title is still
10  correctional officer; is that right?
11    A.  Yes.
12    Q.  And do you have anyone reporting to you right
13  now?
14    A.  No.
15    Q.  I think those are all the questions I have
16  right now on your background.
17    I want to talk to you a little bit about Amos
18  Jones.  Are you familiar with Amos Jones?
19    A.  Yes.
20    Q.  When did you first meet him?
21    A.  Back in -- when I used to work in Delta wing.
22    Q.  Do you remember when exactly during that time
23  period?
24    A.  I want to say 2019.
25    Q.  Do you know if that was early or late 2019?

1    A.  I don't.
2      Q.  Do you remember where you first met him?
3    A.  Conducting a random search on him.
4      Q.  Do you remember when that was?
5    A.  Back in 2019.
6      Q.  That was the first time you had ever
7  encountered him?
8    A.  Yes.
9      Q.  Can you estimate how many times you've spoken
10  to Mr. Jones since then?
11    A.  None.
12    Q.  So since the random search on Mr. Jones in
13  2019, you've had no other conversations with Mr. Jones,
14  right?
15    A.  Not that I can recall.
16    Q.  Have you had any other encounters with
17  Mr. Jones since then?
18    MR. QUINN:  Objection.  Vague and ambiguous
19  with regard to the term "encounters" but you can answer.
20    THE WITNESS:  Not that I can recall.
21  BY MS. DAVIDSON:
22    Q.  So the last time you spoke to Mr. Jones was
23  also in 2019; is that right?
24    A.  Yes.
25    Q.  Have you ever reviewed Mr. Jones' central

1  file?
2       A.  No.
3       Q.  Are you aware of why he is incarcerated?
4       A.  No.
5       Q.  What was your impression of Mr. Jones as an
6  inmate from your one encounter?
7       MR. QUINN:  Objection.  Vague and ambiguous
8  with regard to the term "impression."  Calls for
9  speculation.
10      You can answer.
11      THE WITNESS:  My encounter with him, that --
12  back in 2019, very hostile, clearly did not like
13  authority -- or I should say he disliked officers.
14 BY MS. DAVIDSON:
15      Q.  Why did you think he disliked officers?
16      A.  Just the way he came off when I approached him
17  as far as conducting a random search on him.
18      Q.  Can you explain what you mean by the way he
19  came off?
20      A.  Angry.
21      Q.  And how could you tell he was angry?
22      A.  The tone in his voice and he was loud.
23      Q.  Is there anything else that gave you the
24  impression that he was angry or hostile?
25      A.  No.

Page 33

1       Q.  Has Mr. Jones caused any trouble for you in
2  your career?
3       MR. QUINN:  Objection.  Vague and ambiguous as
4  to the term "trouble."
5       You can answer.
6       THE WITNESS:  No.
7  BY MS. DAVIDSON:
8       Q.  Have you or any other officers ever had to
9  send Mr. Jones to administrative segregation?
10      MR. QUINN:  Objection.  Assumes facts not in
11 evidence.
12      You can answer if you --
13      THE WITNESS:  Not that I can recall.
14 BY MS. DAVIDSON:
15      Q.  And is administrative segregation also known
16  as the hole?
17      A.  Yes.
18      Q.  And you understand that you're here today
19  being deposed in a lawsuit filed by Mr. Jones, right?
20      A.  Yes.
21      Q.  And do you have an understanding of the claims
22  that he alleged in this lawsuit?
23      A.  Yes.
24      Q.  And what is your understanding of those
25  claims?

Page 34

1       A.  That I violated policy as far as searching
2  him.
3       Q.  I want to talk a little bit about the other
4  defendant, Officer Madsen.  Do you know her?
5       A.  Yes.
6       Q.  When did you first meet?
7       A.  When I first started with CTF.
8       Q.  Would that be in 2017?
9       A.  Yes.
10      Q.  Do you remember how you first met?
11      A.  Working here at CTF.
12      Q.  Were you assigned to the same facility?
13      A.  When we first met?  No.
14      Q.  Are you assigned to the same facility now?
15      A.  Yes.
16      Q.  How long have you guys been working in the
17  same facility together?
18      A.  Approximately over two years.
19      Q.  So about 2020 to 2022; is that right?
20      A.  Yes.
21      Q.  So before you began working together in the
22  same unit, how often did you see her?
23      MR. QUINN:  Objection.  Vague and ambiguous.
24      You can answer if you understand the question.
25      THE WITNESS:  I don't understand the question.

Page 35

1  BY MS. DAVIDSON:
2       Q.  How often did you see Officer Madsen prior to
3  working together in the same unit?
4       MR. QUINN:  Objection.  Calls for speculation.
5  Vague and ambiguous with regard to the term "see."
6       If you understand the question, you can
7  answer.
8       THE WITNESS:  I would see her when she was
9  working.
10 BY MS. DAVIDSON:
11      Q.  How often would you see her when she was
12  working?
13      A.  Five days out of the week.
14      Q.  How long would you talk to her when you saw
15  her?
16      MR. QUINN:  Objection.  Assumes facts not in
17  evidence.  There's no testimony that he talked to her.
18 BY MS. DAVIDSON:
19      Q.  You can answer.
20      MR. QUINN:  You can still answer or you can
21  have her -- ask to rephrase.
22      THE WITNESS:  Can you rephrase the question,
23  please?
24 BY MS. DAVIDSON:
25      Q.  You testified that you saw Officer Madsen five

Page 36

**Page 77**

```
 1        THE WITNESS:  It can be like medical or
 2   they're going to work or education.
 3   BY MS. DAVIDSON:
 4        Q.  And do you remember if Officer Madsen was
 5   there at that time?
 6        A.  I do.  She was there.
 7        Q.  Where was she?
 8        A.  She was working across the building I was
 9   assigned to.
10        Q.  When you mean across the building, do you mean
11   she was on the same corridor?
12        A.  Yes, on the same corridor.
13        Q.  Just at opposite ends of the corridor?
14        A.  Correct.
15        Q.  And about how far apart were you guys?
16        A.  Approximately 10 feet.
17        Q.  Did Officer Madsen ever call you over to
18   search an inmate on that day?
19        A.  No.
20        Q.  And did Officer Madsen tell you that Mr. Jones
21   was one of the inmates that had written her up?
22        A.  No.
23        Q.  And did Officer Madsen tell you to search
24   Mr. Jones?
25        A.  No.
```

**Page 78**

```
 1        Q.  Did Officer Madsen say "search his ass" in
 2   relation to Mr. Jones?
 3        A.  No.
 4        Q.  Did you conduct a search of Mr. Jones that
 5   day?
 6        A.  Yes.
 7        Q.  Whose decision was it to search Mr. Jones?
 8        A.  My decision.
 9        Q.  And why did you decide to search him?
10        A.  It was randomly.
11        Q.  And did you advise Mr. Jones why you were
12   searching him?
13        A.  Yes, I told him it was going to be a random
14   pat down.
15        Q.  And where was Mr. Jones when you told him you
16   were going to conduct a random pat down?
17        A.  Out in the corridor while I was providing
18   corridor coverage.
19        Q.  How far away was he?
20        MR. QUINN:  Objection.  Vague and ambiguous.
21        If you understand the question, go ahead.
22        THE WITNESS:  I don't know how far he was.
23   Like I said, our door -- my housing unit from where
24   Officer Madsen was working was approximately 10 feet.
25   When you stand in a corridor, you're standing in the
```

**Page 79**

```
 1   middle, so I want to say 5 feet.
 2   BY MS. DAVIDSON:
 3        Q.  So Mr. Jones was between you and Officer
 4   Madsen?
 5        A.  In the corridor.
 6        Q.  Yes, right, between both of you in the
 7   corridor; is that right?
 8        MR. QUINN:  Objection.  Misstates testimony.
 9        If you understand, you can answer.
10        THE WITNESS:  I don't understand.
11   BY MS. DAVIDSON:
12        Q.  You said Mr. Jones was in the corridor.  Was
13   he between you and Officer Madsen in the corridor?
14        A.  He was in between the housing unit where I
15   worked and the housing unit Officer Madsen worked.
16        Q.  And when Mr. Jones was told he was going to
17   have a random search, where was Officer Madsen?
18        A.  I don't recall.
19        Q.  How did Mr. Jones react when you told him you
20   were going to conduct a random search?
21        A.  He was upset.
22        Q.  What other officer was near you when you told
23   him you were going to conduct a random search?
24        A.  I believe that's when Officer Madsen stepped
25   out from her -- from her housing unit.
```

**Page 80**

```
 1        Q.  And Officer Madsen came towards both of you?
 2        A.  Yes.
 3        Q.  And did she hear you say that you were going
 4   to conduct a random search of Mr. Jones?
 5        A.  I don't know if she heard it or not.
 6        Q.  And do you remember if Officer Madsen said
 7   anything before you conducted the search of Mr. Jones?
 8        A.  No.
 9        Q.  And did Mr. Jones say anything after you told
10   him you were going to conduct a random search?
11        A.  No.
12        Q.  And can you explain how you conducted the
13   search?
14        A.  Like I said, I start from the wrist down to
15   their arm.  If they've got long sleeves, check the
16   sleeves, check their pockets, check their shoes, and
17   then I check the inseam of their waistband, make sure
18   they ain't got no weapons or drugs.
19        Q.  Did Mr. Jones have long sleeves that day?
20        A.  I don't recall if he did or not.
21        Q.  And was Mr. Jones against the wall while you
22   were searching him?
23        A.  He had his hands on the wall and I had him
24   widen his stance for me to conduct a pat down.
25        Q.  Was he facing you or facing the wall?
```

**EXHIBIT B**



UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

: : : : : : : :

AMOS JONES,

**CERTIFIED TRANSCRIPT**

                    Plaintiff,

vs.                          No.: 3:20-cv-04093-TSH

S. MORA, ET AL.,

                    Defendants.

_____/

REMOTE DEPOSITION VIA ZOOM OF

HALEY MADSEN

Thursday, May 12, 2022

REPORTED BY:

MARY ANN SCANLAN, CSR NO. 8875 RDR-CRR-CCRR-CLR

SCANLAN STONE REPORTERS
Certified Shorthand Reporters
408 Columbus Avenue, Suite 2, San Francisco CA 94133
o / 415.834.1114  f / 415.399.9266
e / info@scanlanstone.com  w / scanlanstone.com

Page 2

---

1          APPEARANCES (CONTINUED)
2
3   FOR DEFENDANTS MADSEN AND MORA:
4       ATTORNEY GENERAL OF CALIFORNIA
5       By:  ANTHONY TARTAGLIO
6          MICHAEL QUINN
7       Deputy Attorney General
8       455 Golden Gate Avenue, Suite 11000
9       San Francisco, California 94102-7004
10      415.510.3611
11      E-mail:  Anthony.Tartaglio@doj.ca.gov
12          Michael.Quinn@doj.ca.gov
13
14
15
16
17
18              : : : : : : : :
19
20
21
22
23
24
25
                                          Page 3

---

1          APPEARANCES
2   FOR THE PLAINTIFF AMOS JONES:
3       JONES DAY
4       BY:  KYLE MORENO
5       Attorney at Law
6       1755 Embarcadero Road
7       Palo Alto, California  94303
8       650.739.3968
9       Email:  kamoreno@jonesday.com
10
11      JONES DAY
12      BY:  KELSEY DAVIDSON
13      Attorney at Law
14      555 California Street, 26th Floor
15      San Francisco, California 94104
16      415.626.3939
17      Email:  kelseydavidson@jonesday.com
18
19
20
21
22
23
24
25
                                          Page 2

---

1              I N D E X
2   EXAMINATION                          PAGE
3   By Mr. Moreno                           8
    By Mr. Tartaglio                      173
4
    FURTHER EXAMINATION
5
    By Mr. Moreno                         176
6
7
8              : : : : : : : :
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 4

1    A.  Because I'm a peace officer and I want to do
2  better for our state and make sure that my family and
3  your family is safe, sir.
4    Q.  Understood.
5        So is working for investigations considered a
6  promotion from your previous job as a correctional
7  officer?
8    A.  No, it's the same pay.
9    Q.  I'm just -- can you explain why -- I'm sorry.
10 I'll move on.
11       Just so I'm clear, during the relevant time
12 period for this matter, for this lawsuit, which would be
13 around September to December 2019, what was your job
14 title then?
15   A.  I was a correctional officer in a housing
16 unit.
17   Q.  Do you remember what housing unit you were
18 assigned to?
19   A.  Yes.
20   Q.  What was that?
21   A.  George wing, G-wing.
22   Q.  And now during that relevant period we're
23 discussing, do you remember who your supervisor was?
24   A.  Yes.
25   Q.  And who was that?

                                            Page 25

1    A.  I had three different supervisors, so it kind
2  of depends on what rank you want.
3    Q.  What were the name of your three supervisors?
4    A.  Captain Naranjo, Lieutenant Hopkins, and
5  Sergeant Hernandez.
6    Q.  During this time period, were you the same
7  rank as Officer Mora?
8    A.  I was.
9    Q.  Did anyone report to you during this time
10 period?
11   A.  No.
12   Q.  All right.  Moving on a little bit, are you
13 familiar with Amos Jones?
14   A.  I'm familiar with the inmate, yes.
15   Q.  When did you first meet him?
16   A.  When I started working in the housing unit.
17   Q.  In George wing?
18   A.  Yes.
19   Q.  Do you remember your first meeting with him?
20   A.  No, I don't recall it.
21   Q.  After first meeting Mr. Jones, how many
22 times -- excuse me, I'll rephrase.
23       Since meeting Mr. Jones for the first time,
24 can you estimate how many times you've spoken with
25 Mr. Jones since then?

                                            Page 26

1    A.  No, I can't.
2    Q.  Have you seen him more than once?
3    A.  Yes.
4    Q.  Would you see him every day when you were
5  assigned to his housing unit?
6    A.  Yes.
7    Q.  How many times a day approximately?
8    A.  I worked in the housing unit 40 hours a week.
9    Q.  I'm sorry, how many times a day about would
10 you see Mr. Jones when you were working there?
11   A.  I worked in there 40 hours a week, so I would
12 see him on a variety of different times.  We're there to
13 make sure they're alive, breathing, and making sure
14 they're doing okay and when we have to let them out.
15       So I can't give you a time period.  All I know
16 is that I worked in the building for 40 hours a week, so
17 I would see him a variety of different times.
18   Q.  Would you say you would see him more than five
19 times a day?
20   A.  Yes.
21   Q.  More than ten times a day?
22   A.  Possibly.
23   Q.  When was the last time you spoke with
24 Mr. Jones?
25   A.  I don't recall.

                                            Page 27

1    Q.  Have you spoken with him since you left George
2  wing?
3    A.  I don't believe I have.
4    Q.  Have you seen him since you left George wing?
5    A.  Yes.
6    Q.  When did you see him?
7    A.  I don't recall a date.
8    Q.  Where did you see Mr. Jones since you've left
9  George wing if you aren't working there anymore?
10   A.  Within the prison.
11   Q.  Have you ever reviewed Mr. Jones' central
12 file?
13   A.  I don't believe I have.
14   Q.  Officer, did Mr. Jones have a moniker within
15 the prison that you're aware of?
16   A.  He does.
17   Q.  What is that moniker?
18   A.  Redman.
19   Q.  Redman, that's R-E-D-M-A-N?
20   A.  I believe that's the correct spelling.
21   Q.  Is that just how he's known by inmates or is
22 that how he's known by correctional officers as well?
23   A.  Inmates.
24   Q.  Does he have any other moniker that you're
25 aware of?

                                            Page 28

**Page 29**

1    A.  Not that I'm aware of.

2    Q.  Officer, are you aware of why Mr. Jones is

3    incarcerated?

4    A.  I am not.

5    Q.  So you mentioned that you had likely more than

6    five interactions a day with Mr. Jones when you were

7    working in George wing.  What was your impression of

8    Mr. Jones as an inmate?

9    A.  Can you rephrase that question?

10    Q.  Sure.

11         In all your interactions with Mr. Jones when

12    you were working there, what was your impression of him?

13         MR. TARTAGLIO:  Objection.  Vague.

14         Go ahead.

15    BY MR. MORENO:

16    Q.  You can answer.

17         MR. TARTAGLIO:  After I make an objection, you

18    can go ahead and answer, Officer Madsen.

19         THE WITNESS:  Okay.

20         He was just like any other inmate.

21         MR. MORENO:  Kelsey, you are not on mute.

22         MS. DAVIDSON:  Sorry.

23         MR. MORENO:  Sorry about that.

24         MS. DAVIDSON:  I was trying to switch my phone

25    audio.

**Page 30**

1         MR. MORENO:  No problem.

2         Mary Ann, I'm sorry, can you read back my last

3    question, please?

4         THE REPORTER:  Yes.

5         MR. MORENO:  Thank you.

6         (Record read as follows:

7         "Q.  In all your interactions with

8         Mr. Jones when you were working

9         there, what was your impression of

10         him?")

11         THE REPORTER:  Then there was an objection and

12    the witness answered.

13         (Record read as follows:

14         "A.  Okay.  He was just like any

15         other inmate.")

16    BY MR. MORENO:

17    Q.  Officer, what do you mean that he was just

18    like every other inmate?

19    A.  I treat every inmate the same.  They're

20    inmates at the end of the day.

21    Q.  Understood.

22         Did you get the impression that Mr. Jones was

23    hardworking?

24    A.  No.

25    Q.  Did you get the impression he was not

**Page 31**

1    hardworking?

2    A.  I didn't really get an impression of him

3    whatsoever.

4    Q.  Based on your interactions with Mr. Jones,

5    would you say that he's easygoing?

6    A.  I have no impression of the inmate at all, so

7    I can't really answer that for you.

8    Q.  Understood.  So you wouldn't have an

9    impression of whether he was a troublemaker?

10    A.  I believed at the time that he was introducing

11    narcotics into CTF.

12    Q.  Okay.

13         Is that the only thing that would give you the

14    impression that he was a troublemaker?

15    A.  Yes.

16    Q.  Has Mr. Jones caused any trouble for you

17    specifically?

18    A.  Nope.

19    Q.  Has Mr. Jones -- excuse me, I'll rephrase.

20         Has Mr. Jones started any fights to your

21    knowledge?

22    A.  I believe he was involved with an in-cell

23    fight.

24    Q.  How were you aware of that?

25    A.  I worked the housing unit.

**Page 32**

1    Q.  Did you observe the fight?

2    A.  I did not.

3    Q.  So when there's a fight in the housing unit,

4    you generally would hear about it if you're working

5    there?

6    A.  Yes, we're briefed on incidents that occur.

7    Q.  Have you or any other officers that you know

8    of ever had to send Mr. Jones to administrative

9    segregation?

10    A.  I'm aware of that investigative services unit

11    and the ad-seg prior to my arrival to investigative

12    services unit.

13    Q.  How are you aware of that?

14    A.  He was in my housing unit and I was there the

15    night he went to administrative segregation.

16    Q.  Did you personally take him to administrative

17    segregation?

18    A.  I was not involved with that incident

19    whatsoever.

20    Q.  So just help me understand.  When you say you

21    were there when he was taken to administrative

22    segregation?

23    A.  There was an operation that night and I was

24    assigned another inmate's cell.

25    Q.  Understood.  And you saw Mr. Jones getting

1  taken to administrative segregation?
2       A.  Yes.
3       Q.  Just to clarify, you did not take him or
4  follow him to administrative segregation?
5       A.  No, sir.
6       Q.  Understood.
7            Did you request to have him put in
8  administrative segregation?
9       A.  No, sir.
10      Q.  Do you have any reason to believe Mr. Jones
11  was a threat to the security of the prison?
12      A.  Yes.
13      Q.  What is your reason to believe that?
14      A.  He was introducing narcotics into CTF, which
15  can harm people, hurt people, kill people, and there
16  could be murders and attempted murders due to
17  introducing narcotics into an institution.
18      Q.  You said there was an operation the day he
19  was -- excuse me, the date Mr. Jones was brought to
20  administrative segregation.  What was that operation?
21      A.  I don't fully know what the operation was.  I
22  was just requested to assist on the searching of another
23  inmate.
24      Q.  So if there's an operation, you're not always
25  made aware of it?

Page 33

1       A.  You're only given information pertaining to
2  whatever inmate you'll be dealing with.
3       Q.  Do you remember what information you were
4  given regarding the operation?
5       A.  Yes, I was to search an inmate's cell, and
6  that's the information I was given on that date.
7       Q.  Was that inmate cell Mr. Jones' cell?
8       A.  No.
9       Q.  Do you remember what inmate's cell it was?
10      A.  I don't recall the inmate's last name, no.
11      Q.  Do you remember the inmate's first name?
12      A.  No, I don't.  I don't.  He lived across from
13  Jones in a different area.
14      Q.  Officer, you understand that you're here today
15  being deposed in a lawsuit filed by Amos Jones, correct?
16      A.  I am.
17      Q.  Do you have an understanding of the claims
18  alleged in this lawsuit?
19      A.  Yes.
20      Q.  What is your understanding of the claims?
21      A.  That it was a retaliatory search done by
22  Officer Mora on my behalf.
23      Q.  So you mentioned Officer Mora.  I want to ask
24  questions about your relationship with him.
25           Do you know Officer Mora?

Page 34

1       A.  I do.
2       Q.  When did you first meet him?
3       A.  When he started at the department.
4       Q.  Do you know about when that was?
5       A.  I do not.
6       Q.  Did he start after you started?
7       A.  He started afterwards.
8       Q.  Do you have an estimate of how long
9  afterwards?
10      A.  No, I don't.
11      Q.  Where did you meet him?
12      A.  I met him in the department.
13      Q.  Just so I understand, what do you mean by the
14  department?
15      A.  CTF.
16      Q.  When was the last time you spoke to
17  Officer Mora?
18      A.  This morning.
19      Q.  What did you speak to him about?
20      A.  What we were going to have for lunch.
21      Q.  Just to clarify, you didn't speak to him at
22  all about this lawsuit?
23      A.  No.
24      Q.  Were you ever Officer Mora's supervisor?
25      A.  No, I'm an officer, just like he is.

Page 35

1       Q.  How would you describe your relationship with
2  Officer Mora?
3       A.  He's one of my partners.
4       Q.  Do you have a good relationship?
5       A.  Yes.
6       Q.  Do you guys get along?
7       A.  Yes.
8       Q.  Would you consider Officer Mora a friend?
9       A.  I would.
10      Q.  Do you guys socialize outside of work?
11      A.  No.
12      Q.  Have you ever seen each other outside of work?
13      A.  Yeah, our county is not that big.
14      Q.  But these interactions with him outside of
15  work have not been planned; is that correct?
16      A.  No.
17      Q.  Sorry, just so I understand, no, they have not
18  been planned or organized by you two?
19      A.  No.
20      Q.  How frequently do you see Officer Mora at
21  work?
22      A.  I work with him five days a week.
23      Q.  So you see him every day?
24      A.  Yes.
25      Q.  How many times in a day approximately do you

Page 36

1  document.  This will be Exhibit 20.
2       Q.  Can you see my screen, Officer Madsen?
3       A.  Yes.
4       Q.  Scrolling down to the bottom of page 1 here,
5  you see it says AEO0001997?
6       A.  Yeah.
7       Q.  Scrolling to the last page -- for the record,
8  the last page you see at the bottom right here it says
9  AEO0002009?
10      A.  Yes.
11      Q.  At the top of page 1 here it says from
12  MadsenHaley@CDCR?
13      A.  Yes.
14      Q.  Is that your email?
15      A.  Yes.
16      Q.  The next line it says, 9/1/2019, 7:42 p.m.  Do
17  you see that?
18      A.  Yep.
19      Q.  Do you see in the body of the email it says,
20  the hit list I have come up with all reasonable
21  suspicion; I put notes on the guys I believe are
22  holding?
23      A.  Yes.
24      Q.  I'm sorry, I forgot in the to line it says
25  here to StephensArlene@CDCR.

Page 69

1       A.  Yes.
2       Q.  Is that Officer Stephens' email?
3       A.  That is Lieutenant Stephens' email, yes.
4       Q.  I apologize, Lieutenant Stephens.
5           So what is the purpose of this email -- of
6  sending this to Lieutenant Stephens?
7       A.  From my recollection of it, she, I believe,
8  during that time period may have just come in to the
9  building.  I'm not a hundred percent sure of what her
10  start date was.  She was a new partner and I had been in
11  the building.
12          Those are guys that I probably put notes next
13  to, just based off of reading and seeing that -- a lot
14  of stuff is redacted -- of guys that I believe were
15  either holding cell phones or narcotics or weapons.
16          And it's our job as a building officer to
17  secure inmates from doing that and to hold people
18  accountable for their criminal activities.  So I would
19  safely assume that I had notes on there stating that I
20  believe this person was running narcotics, holding
21  narcotics, cell phones, weapons.
22      Q.  Scrolling down on page 2 at the top, inmates
23  by housing area?
24      A.  Yes.
25      Q.  I know, a lot of redacted here.  Excuse me,

Page 70

1  I'll scroll down to page 4.  Do you see that this cell
2  in the middle of the page, in the second cell it says
3  Jones, Amos?
4       A.  Yes.
5       Q.  And then, all the way to the right, there's a
6  picture of an inmate there?
7       A.  Yes.
8       Q.  Do you see that?
9       A.  Yes.
10      Q.  In the cell to the left of that, it says,
11  phone and drugs?
12      A.  Yes.
13      Q.  Are these the notes that you were explaining
14  to me earlier?
15      A.  Yes.
16      Q.  Did you create this list?
17      A.  I did.
18      Q.  Just to confirm, you said an inmate would get
19  on this list if you suspect that they -- I'm sorry, let
20  me rephrase that.
21          Can you explain to me how an inmate would get
22  on this list that you created?
23      A.  It's off of my observations as an officer,
24  informants, other searches that -- say, I went into
25  another cell within my housing unit and I saw an

Page 71

1  inmate's name on like a ledger, per se, and it said that
2  they owed three, $400, it would be safe to assume that
3  they owe that money for narcotics.
4       Q.  Just to be clear, what does it mean when it
5  says here "phone and drugs" in the row for Amos Jones?
6       A.  That that cell was going to have a phone and
7  narcotics within the cell.
8       Q.  Why did you believe that Amos Jones cell would
9  have a phone and narcotics in the cell?
10      A.  Based off of my observations as an officer.
11      Q.  And what were those observations?
12      A.  I work the building 40 hours a week, so I
13  observe -- I don't recall the amount of inmates I had in
14  my building, but if you scroll all the way down, at that
15  time it will give a number.
16      Q.  I'm at the bottom here.  It says, total
17  assigned 107.  Is that what you're referring to?
18      A.  Yes, but each page; so there's first tier,
19  second tier, third tier, so 107 plus whatever else is
20  above that on the second and the first tier.
21          I would say there's probably approximately
22  high 200s to low 300 inmates in my building, one of the
23  bigger buildings within the facility.
24          I wouldn't just sit in my office.  I'm a
25  proactive officer, so I would sit on the tier above all

Page 72

1  the inmates so I would see who they're interacting with.
2        And inmates can act suspicious with officers
3  in the nature of, hey, you know, come here, I want to
4  have a casual conversation with you and they start
5  acting in a strange manner that you and I wouldn't act
6  upon.  Typically, that's a good sign to know that
7  someone has something on them.
8        So just based off of observations and dealing
9  with other inmates and seeing who other inmates are
10 dealing with and hanging out with -- and I wasn't always
11 just a housing unit officer.  I was a yard officer as
12 well, so I got to see them when they were on their
13 recreational yards and seeing who they're dealing with.
14       And knowing that Amos was involved with the
15 Black Guerrilla Family, it was safe for me to assume
16 that he was trafficking narcotics through the CTF
17 prison.
18    Q.  Thank you.  I appreciate that explanation.
19       Do you remember, other than your knowledge
20 Amos being involved with the Black Guerrilla Family, if
21 there was anything else that would lead you to suspect
22 Amos had a phone and drugs in his cell?
23    A.  Typically, when someone is trafficking
24 narcotics through a facility, they have a cell phone so
25 they can talk to the person on the outside that's

Page 73

1  orchestrating the narcotics being actually trafficked in
2  the institution for the inmate to successfully be able
3  to get it and then traffic it through the actual
4  facility itself.
5        Just based off of my observations, that's what
6  I observed.  And I was a visiting officer as well, so I
7  saw a variety of different inmates with their visitors
8  where sort of inmates have been placed in administrative
9  segregation and their family members or whoever they are
10 related to them being arrested and put into the county
11 jail for introducing narcotics.
12       So I was able -- based on all my observations
13 throughout my whole career, I was able to determine that
14 it would be safe to say that he was going to have a cell
15 phone and narcotics within his cell.
16    Q.  Understood.
17       Just to be clear, in addition to your
18 training, which I understand, and all your observations,
19 was there anything specific related to Amos Jones that
20 would lead you to believe he had a phone and drugs in
21 his cell?
22    A.  No, other than the fact that every time he
23 would come in my building he would put his head down and
24 not want to interact with me.  That's not a usual --
25 what I'm trying to say is like you and I having this

Page 74

1  interaction, it's casual, right, versus if you saw me
2  you keep your head down.  That's just an obvious sign of
3  hey, what's going on with you, what's wrong.
4        As an officer, I want to make sure you're
5  okay, but also why are you not acknowledging me in that
6  manner as well?
7        So based off of seeing it physically,
8  observations of body language, it's safe to assume.
9    Q.  And would Amos walk by you with his -- just --
10 let me rephrase.
11       To be clear on time frame, I'm talking about
12 around September to December 2019 when you were working
13 in George wing where Amos was.  Do you understand that?
14    A.  Yeah, I do.
15       I'm a very proactive officer, so inmates that
16 were typically holding narcotics would try to avoid me
17 because I do my job and I'm very proactive.
18    Q.  And you said Amos would walk by you with his
19 head down.  Was that very frequent during the time you
20 were working George wing?  Was that every -- excuse me,
21 let me rephrase.
22       Was that every time you would see him?
23    A.  I don't recall a specific amount of times, but
24 more than often, that's how his disposition would be
25 toward me.

Page 75

1    Q.  Is Amos the only one whose disposition would
2  be like that toward you?
3    A.  No.
4    Q.  How many, approximately, inmates would have
5  that disposition toward you?
6    A.  I don't even have a number to give you,
7  inmates that were involved in narcotic trafficking.
8    Q.  Just to be clear, would you say all the
9  inmates acted that way toward you?
10   A.  No.
11   Q.  Maybe half the inmates?
12   A.  Not even half; a handful.
13   Q.  I'm back at the top page of this document
14 here, back to the email.  It says -- you see it says hit
15 list right here?
16   A.  Yes.
17   Q.  What do you mean by hit list?
18   A.  Searching.
19   Q.  Okay.  Are you saying these are -- the inmates
20 on this list are inmates to search?
21   A.  Yeah.
22   Q.  So would you search all the inmates on that
23 list?
24   A.  If I have the time and attempted to, yes.
25   Q.  Do you remember whether you searched all the

Page 76



**Page 93**

1    Q.  Okay.

2        Is it safe to say you would conduct more than

3    ten a day?

4    A.  Absolutely.

5    Q.  More than 20?

6    A.  Probably.

7    Q.  More than 50?

8    A.  That's stretching it, but possibly.

9    Q.  Okay.  Understood.

10       So I want to ask some questions about the

11   search of Amos Jones on November 23, 2019, at issue in

12   this case.

13       Do you remember what your duties were on

14   November 23, 2019?

15   A.  It's safe to assume that I was working George

16   wing that day.

17   Q.  Okay.

18       Is it safe to say, then, that you were in

19   George wing around 1:00 p.m. that day?

20   A.  Yes.

21   Q.  Did you have any specific duty around

22   1:00 p.m. that day?

23   A.  Not that I recall.

24   Q.  Do you recall which specific part of George

25   wing you were in around that time?

**Page 94**

1    A.  I don't.

2    Q.  Generally, during that period, where in George

3    wing would you work around 1:00 p.m. or around

4    lunchtime?

5    A.  I didn't keep my schedule the same because, at

6    the end of the day, inmates are criminals and they're

7    watching me as much as I watch them, so I never really

8    had a physical routine of how I did things.  I always

9    changed it up for my safety.

10   Q.  Do you remember working corridor coverage

11   around this time?

12   A.  It's possible that I was.

13   Q.  And what does working corridor coverage

14   entail?

15   A.  It's typically doing mass movement like yard

16   release -- just yard release, any other type of MF.  If

17   there's an emergency where we have to move inmates out

18   of the building into the yard, fire, nature, things like

19   that, education, breakfast, lunch, all that different

20   stuff, so it kind of depends on what time of the day it

21   is and what the program is like.

22       Because it's prison, things can happen and the

23   program can be changed a million times over in one day.

24       Go stand out in the corridor, make sure

25   there's no emergencies going on, no fights, anything in

**Page 95**

1    that nature, conduct random pat downs, casual

2    encounters.

3    Q.  So you say you would conduct random pat downs

4    in corridor coverage, correct?

5    A.  Yes, sir.

6    Q.  How would you determine which inmates to

7    conduct these random pat downs?

8    A.  There was no -- no -- I don't know what word

9    I'm trying to use right now, but no specific inmate.

10   It's just you're an inmate at the end of the day, you're

11   going to get searched.

12   Q.  Was there like a certain number of inmates you

13   would pass up and then randomly do the next one?

14   A.  No.

15   Q.  No, it just was completely random?

16   A.  Yes, sir.

17   Q.  When you're working corridor coverage,

18   approximately how many inmates would you search during

19   that time?

20   A.  It varied throughout the day, just depending

21   on what day it was, what was going on in the prison, so

22   I can't give you a specific amount because every day

23   fluctuated from different ones.

24   Q.  Do you remember on November 23rd how many pat

25   down searches you conducted during corridor coverage?

**Page 96**

1    A.  No, I don't count.  I don't have stats.  I

2    don't do any of that stuff, so I can't give you a -- I'm

3    just doing my job at the end of the day.

4    Q.  During corridor coverage would you conduct

5    more than 20 pat down searches?

6    A.  Somewhere between five to 20 to 30 to 40 to

7    50, it just kind of depends on the day and what's going

8    on.

9    Q.  Can you explain what it depends on the number

10   of searches?

11   A.  If there's an emergency throughout the

12   facility, if there's a riot, if we have program -- if we

13   do have program or if we don't have program.

14   Q.  Do you remember if you had an emergency in the

15   facility on this day?

16   A.  I don't.

17   Q.  Do you remember whether it was a relatively

18   busy day?

19   A.  I don't recall.

20   Q.  Do you recall Officer Mora conducting a search

21   of Amos Jones on this date?

22   A.  I do recall.

23   Q.  Where were you when this occurred?

24   A.  I don't recall where I was during the

25   beginning, the initial contact.

1    Q.  Were you -- when did you see the initial
2    contact?
3    A.  I believe I stepped outside the building, but
4    I don't recall.
5    Q.  I'm sorry, you stepped outside the building
6    during the search?
7    A.  I believe I did, but I don't recall.
8    Q.  Do you remember how close you were to
9    Officer Mora when you searched Mr. Jones?
10   A.  I can't give you like a feet, but I was
11   probably fairly close to provide coverage to my partner
12   just in case.  It's very typical for inmates to batter
13   officers, so typically you have a cover officer there to
14   assist you if anything is needed.
15   Q.  And at what point in the search did you go to
16   provide coverage?
17   A.  I don't recall.
18   Q.  Did you see the entire search?
19   A.  I don't recall.
20   Q.  Do you recall seeing the search?
21   A.  Yes.
22   Q.  Where in the corridor was Officer Mora when
23   the search started?
24   A.  Somewhere between my building and his
25   building; I don't recall a specific location.

Page 97

1    Q.  vicinity to Officer Mora to provide coverage?
2    A.  Correct.
3    Q.  So that is why you provided coverage to him
4    because you were the closest?
5    A.  Correct.
6    Q.  Approximately how long was the search?
7    A.  I don't recall a specific time, but typically
8    a pat down is anywhere from ten seconds to 30 seconds,
9    just kind of depending on how many layers of clothing
10   inmates have on, how much property is on them, being
11   able to go through it.
12   Q.  Was this search on the longer end of what you
13   just described?
14   A.  No.
15   Q.  So it's fair to say it was an average length
16   of time?
17   A.  Yes, sir.
18   Q.  And how did the search start?
19   A.  I don't recall because I don't believe I was
20   there on the initial contact, but Officer Mora is a very
21   proactive officer, too; he searches inmates just as much
22   as any other officer does.
23   Q.  So when you go to provide cover and arrive
24   near the search, at what part of the search is
25   Officer Mora in?

Page 99

1    Our door, our housing unit doors are probably
2    approximately 10 feet across from each other, so...
3    Q.  Were there any other officers around during
4    the search?
5    A.  I don't recall.
6    Q.  I'm just trying to understand, why would it be
7    you that provided cover for the search?
8    A.  Well, we've got -- just think of like a
9    straight building and then you got a building right here
10   and a building right here and there's this long
11   corridor, so we all step out to provide the security for
12   the institution.
13   So typically you have officers that are
14   staggered throughout the whole corridor and whoever
15   works across the way, you end up typically partnering up
16   with because you're not going to let a partner have an
17   encounter with an individual where if you go sideways
18   and, God forbid, your partner gets stabbed or murdered
19   in front of you and you're not providing coverage.
20   Q.  Sure.
21   So would it be the officer closest to the
22   officer conducting the search that would provide cover
23   or how do you determine who provides cover?
24   A.  Whoever is in the closest vicinity.
25   Q.  Is it fair to say that you were in the closest

Page 98

1    A.  I don't understand your question.  Can you
2    rephrase it?
3    Q.  Sure.
4    You described there's policies and procedures
5    for how to search -- do a clothed body search of an
6    inmate.  In terms of the timeline of the search, at what
7    point was Officer Mora at when you arrived at the
8    search?
9    A.  I don't recall.
10   Q.  Do you recall where his hands were?
11   A.  I don't recall.
12   So typically, as you're providing coverage to
13   an officer, you're more watching the inmate's hands on
14   the wall.  If they come off, obviously, you know,
15   something is going on, but I did not see anything other
16   than Officer Mora being professional.
17   Q.  So you don't remember directing -- excuse me.
18   Let me rephrase.
19   Did you direct Officer Mora to search
20   Mr. Jones?
21   A.  No, sir.
22   Q.  Did say anything to Officer Mora right before
23   the search of Mr. Jones?
24   A.  No, sir.
25   Q.  Did you tell Officer Mora that Mr. Jones was

Page 100

**EXHIBIT C**

## ICCS002D - Reclassification Scoresheet

Name: JONES, AMOS                                                   CDC#: K29556

| | |
|---|---|
| Action Date: 07/30/2020 | Sequence #: 002 |
| Facility: CTF-Facility C [CTF-C] | |
| Staff: Mondragon, I ██████ | |
| Annual Review: Yes | Corrects Scoresheet done on: |
| Review Period 07/25/2019 | Review Period 07/24/2020 |
| Beginning Date: | Ending Date: |
| Number of 6 Month Periods: 2 | |
| Scoresheet Status: Finalized | As of: 07/31/2020 |

### Favorable Behavior Since Last Review

|  |  |  | Points |
|---|---|---|---|
| 1. Continuous Minimum Custody Periods: | 0 | x 4 | 0 |
| 2. No Serious Disciplinary Periods: | 0 | x 4 | 0 |
| 3. Average or Above Performance in Work, School, or Vocational Programs: | 1 | x 2 | 2 |
| 4. Total Favorable Points | | | 2 |

### Unfavorable Behavior Since Last Review

| Serious Disciplinaries | | Number Of | Points |
|---|---|---|---|
| 1. Div. A-1 / A-2 | | | |
| Date(s) | None | 0 x 8 | 0 |
| Div. B, C, & D | | | |
| Date(s) | 10/09/2019-Possession of a cellular | 1 x 6 | 6 |
| Div. E & F | | | |
| Date(s) | None | 0 x 4 | 0 |
| 2. Battery or Attempted Battery on a Non-Prisoner | | | |
| Date(s) | None | 0 x 8 | 0 |
| 3. Battery or Attempted Battery on an Inmate | | | |
| Date(s) | None | 0 x 4 | 0 |
| 4. Distribution of Drugs | | | |
| Date(s) | None | 0 x 4 | 0 |
| 5. Possession of a Deadly Weapon | | | |
| Date(s) | None | 0 x 16 | 0 |
| 6. Inciting a Disturbance | | | |
| Date(s) | None | 0 x 4 | 0 |
| 7. Battery Causing Serious Injury | | | |
| Date(s) | None | 0 x 16 | 0 |
| 8. Total Unfavorable Points | | | 6 |

### Computation of Score

| | |
|---|---|
| 1. Prior Preliminary Score from Scoresheet dated: 07/30/2020 | 14 |
| 2(a). Minus Total Favorable Points since last review | - 2 |
| 2(b). Plus Total Unfavorable Points since last review | + 6 |
| 2(c). Adjustment for Favorable Points since Corrected Scoresheet | + 0 |
| None | |
| 3. Preliminary Score Subtotal | 18 |
| 4. Change in Sentence Term - Points (Difference in Years x 2) | 0 |
| - Old Sentence Term in Years:       + New Sentence Term in Years: | |
| 5. New Preliminary Score | 18 |

### Placement

| | Points |
|---|---|
| 1. New Preliminary Score | 18 |
| 2. Mandatory Minimum Score Factor: 5-Violence Exclusion | 19 |
| 3. Placement Score | 19 |
| 4. Security Level: II | |

### Comments

RVR dated 02/26/2020 is pending for Conspire-Introduction of a Controlled Substance, division A-2.

TimeStamp: 30 July 2020 09:22:38 --- User: I█████ Mondragon (██████

### Scanned Documents

**Confidentiality Notice**: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Confidential

AEO0001252